Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joanna Rosenblatt, Esq.
Rawson Jahan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (       )
GEICO CASUALTY COMPANY,

                                    Plaintiffs,

                -against-

MEDIHEALTH MEDICAL SYPPLY INC. d/b/a
MEDIHEALTH MEDICAL SUPPLY, YELENA
GORELIK, ZATOR MEDICAL SUPPLIES CORP.,
AAPS MEDICAL SUPPLY CORP., IRINA RADER,
P&S MED EQUIPMENT CORP., SVETLANA
KUPINA, and JOHN DOE DEFENDANTS "1" - "10",

                                    Defendants.
------------------------------------------------------------------X

## **COMPLAINT**

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Medihealth Medical Sypply Inc. d/b/a

Medihealth Medical Supply ("Medihealth Supply"), Yelena Gorelik ("Gorelik"), Zator Medical

Supplies Corp. ("Zator Supplies"), AAPS Medical Supply Corp. ("AAPS Supply"), Irina Rader

("Rader"), P&S Med Equipment Corp. ("P&S Equipment"), Svetlana Kupina ("Kupina") and John Doe Defendants "1"through "10", (collectively, "Defendants"), hereby allege as follows:

## INTRODUCTION

1.       GEICO brings this action to recover more than $305,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted numerous fraudulent "No-Fault" insurance charges through four companies, including Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment (collectively, the "DME Providers"), for medically unnecessary, illusory, and non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD"), comprised of purported osteogenesis stimulators, massagers, custom lumbar and shoulder orthoses, cervical traction units, bed boards, egg crate mattresses, infrared lamps, whirlpools, and other various items of medical equipment (collectively, the "Fraudulent Equipment"). The Fraudulent Equipment is alleged to have been provided to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under No-Fault insurance policies issued by GEICO ("Insureds").

2.       The DME Providers are New York corporations that are purportedly owned on paper by Gorelik, Rader, and Kupina (collectively, the "Paper Owner Defendants"), and Tsar, who, upon information and belief, is deceased. The Paper Owner Defendants and Tsar, in conjunction with others not presently identifiable to GEICO, devised a scheme to exploit the New York No-Fault insurance system by using a series of sham durable medical equipment supply companies to dispense, or purport to dispense, the Fraudulent Equipment to Insureds without regard to actual patient care. In furtherance of the scheme, the Defendants entered into unlawful, collusive arrangements with prescribing healthcare providers (the "Referring Providers") and unlicensed laypersons (the "Clinic Controllers") who are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "Clinics") to have unnecessary

prescriptions, or purported prescriptions, steered to the DME Providers.

3.      Once the prescriptions were secured, the Defendants then billed GEICO collectively more than $1.8 million, with all four DME Providers making virtually identical fraudulent misrepresentations concerning the types of Fraudulent Equipment allegedly provided to Insureds and the maximum reimbursement rates they were entitled to receive. As part of their effort to disguise the scheme, and to extract as much money as possible from GEICO without detection, the Defendants shifted the billing to GEICO from one DME Provider to the next, in sequential order, over the course of thirteen (13) months, between May 2023 and June 2024.

4.      GEICO seeks to terminate this fraudulent scheme and recover more than $305,000.00 that has been wrongfully obtained by the DME Providers, the Paper Owner Defendants, and John Doe Defendants "1" – "10" (collectively, the "Defendants) and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.1 million in pending No-Fault insurance claims that have been submitted by or on behalf of the DME Providers because:

> (i)      The bills for Fraudulent Equipment submitted to GEICO by Defendants were submitted pursuant to a fraudulent scheme designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e., the John Doe Defendants), without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements and which were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;
>
> (ii)     The bills for Fraudulent Equipment submitted to GEICO by the Defendants misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to inflate the reimbursement rate and otherwise fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment;
>
> (iii)    The Defendants billed GEICO for Fraudulent Equipment that was provided as a result of decisions made by laypersons, not based upon legitimate

prescriptions issued by the Referring Providers who are licensed to issue such prescriptions; and

(iv)    The Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits, because they failed to comply with licensing requirements, as the DME Providers were not lawfully licensed by the New York City Department of Consumer and Worker Protection.

5.      The Defendants fall into the following categories:

(i)     The DME Providers are New York corporations that purport to purchase DME from wholesalers, purport to provide the Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)    The Paper Owner Defendants include Gorelik (listed on paper as the owner of Medihealth Supply), Rader (listed on paper as the owner of AAPS Supply), and Kupina (listed on paper as the owner of P&S Equipment), who, as discussed below, work for one of the John Doe Defendants and secretly operated, managed, controlled and financially benefited from the DME Providers and used the DME Providers to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(iii)   John Doe Defendants "1" – "10" ( the "John Doe Defendants") are persons presently not identifiable but who are: (i) secretly controlling and profiting from the DME Providers; (ii) associated with the Clinic Controllers and Referring Providers at the Clinics which are the sources of prescriptions to the DME Providers; and/or (iii) conspiring with the Paper Owner Defendants to further the fraudulent scheme against GEICO and other automobile insurers.

6.      As discussed below, the Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided pursuant to predetermined fraudulent protocols and collusive referral arrangements created by the Defendants and others not presently identifiable to GEICO to enrich themselves, rather than to provide medically necessary treatment for the Insureds; (ii) the bills for Fraudulent Equipment submitted by Defendants mischaracterized the nature of the Fraudulent Equipment and fraudulently and grossly inflated the permissible reimbursement rates that Defendants could have

4

received for the Fraudulent Equipment; (iii) the Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon legitimate prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and (iv) the bills for Fraudulent Equipment submitted by Defendants misrepresented that Defendants complied with all licensing requirements when in fact the DME Providers obtained their purported facially valid licenses through fraud and/or misrepresentations made to the New York City Department of Consumer and Worker Protection.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

8.      The charts attached hereto as Exhibits "1" through "4" set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme through Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment.

9.      The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in 2023 and has continued uninterrupted through the present day, as Defendants continue to seek collection on pending charges for the Fraudulent Equipment.

10.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $305,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New

York.

## II.    **Defendants**

12.    John Doe Defendant "1" (hereinafter, the "Secret Owner") is a citizen of New York and is presently not identifiable but is secretly controlling and profiting from the DME Providers, and conspired with others, who are not presently identifiable, at various Clinics to obtain prescriptions purportedly issued by the Referring Providers that were used by the DME Providers to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

13.    Defendant Medihealth Supply is a New York corporation with its principal place of business in Brooklyn, New York, specifically 2661 Coney Island Ave, Brooklyn, New York (the "Coney Island Avenue Location").  Medihealth Supply was incorporated on May 16, 2023 and is owned on paper and purportedly operated and controlled by Gorelik. In actuality, Secret Owner operated, managed, controlled and financially benefited from Medihealth Supply and, with the aid of Gorelik, used Medihealth Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.    Defendant Gorelik resides in, is domiciles in, and is a citizen of New Jersey and is listed as the paper owner of Medihealth Supply.

15.    Defendant Zator Supplies is a New York corporation with its principal place of business at 604 E 8th St, Brooklyn, New York (the "8th Street Location"). Zator Supplies was incorporated on July 11, 2023, and is owned on paper and purportedly operated and controlled by Tsar. In actuality, Secret Owner operated, managed, controlled and financially benefited from Zator Supplies and, with the aid of Tsar, used Zator Supplies as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.     Defendant AAPS Supply is a New York corporation with its principal place of business at 3203 Quentin Rd Brooklyn, New York (the "Quentin Road Location"). AAPS Supply was incorporated on October 26, 2023, and is owned on paper and purportedly operated and controlled by Rader. In actuality, Secret Owner operated, managed, controlled and financially benefited from AAPS Supply and, with the aid of Rader, used AAPS Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.     Defendant Rader resides in, is domiciled in, and is a citizen of New York and is listed as the paper owner of AAPS Supply.

18.     Defendant P&S Equipment is a New York corporation with its principal place of business at 1639 East 13th St, Brooklyn, New York (the "13th Street Location"). P&S Equipment was incorporated on January 30, 2024, and is owned on paper and purportedly operated and controlled by Kupina. In actuality, Secret Owner operated, managed, controlled and financially benefited from P&S Equipment and, with the aid of Kupina, used P&S Equipment as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

19.     Defendant Kupina resides in, is domiciled in, and is a citizen of New York and is listed as the paper owner of P&S Equipment.

20.     Upon information and belief, the John Doe Defendants reside in and are citizens of New York. The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, controlling and assisting with the operation of the DME Providers, the dispensing of the Fraudulent Equipment, and the billing to insurance companies, as well as engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Providers and furthering the predetermined fraudulent protocols used to maximize profits without regard to

genuine patient care.

### III.    Other Pertinent Individuals

21.    Though not named as a defendant herein, Tsar is listed as the paper owner of Zator Supplies, similar to the Paper Owner Defendants associated with the other DME Providers. Upon information and belief, Tsar died in Florida on or about May 15, 2025, and previously resided in Florida.

### JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

23.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants reside.

### ALLEGATIONS COMMON TO ALL CLAIMS

25.    GEICO underwrites automobile insurance in the State of New York.

### I.    An Overview of the Pertinent Laws

#### A.    Pertinent Laws Governing No-Fault Insurance Reimbursement

26.    New York's "No-Fault" insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services

that they need.

27.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

29.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

31.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a

facially-valid license to determine whether there was a failure to abide by state and local law; and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

32.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

33.     New York City's Administrative Code requires DME suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP") in order to lawfully provide DME to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

34.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a valid Dealer in Products License.  See NYC Admin. Code §20-426.

35.     A Dealer in Products License is obtained by filing a license application with the DCWP. The license application requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The application also requires that the applicant identify, among other pertinent information, the commercial address of

where the DME supplier is physically operating from. The affirmation by the applicant requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

36.    Pursuant to a duly executed assignment, a healthcare provider may submit claims under New York's No-Fault Laws directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

37.    In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

38.    Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

39.    Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.**     **Pertinent Laws and Regulations Governing No-Fault Benefits for DME**

40.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

41.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

42.     Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement". See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist". See N.Y. P.H.L. § 238(11).

43.     A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment," which includes the DME Providers herein.  See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a

practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

44.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("DME Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

45.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

46.     According to the DME Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for a specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

47.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

48.     The DME Fee Schedule uses HCPCS Codes promulgated by Palmetto to identify the maximum charge for selling specific DME and for renting Fee Schedule items on a weekly basis.

49.     Where a specific piece of DME does not have a maximum reimbursement rate in the DME Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

50.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

51.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)      The provider is in compliance with all material statutory and regulatory requirements;

(ii)     The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME and/or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)     The HCPCS Code identified in the bill actually represents the DME or OD

that was provided to the patient; and

(v)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    **Defendants' Fraudulent Scheme**

52.    Beginning in 2023, and continuing uninterrupted through the present day, the Defendants implemented a complex, integrated fraudulent scheme in which they used the Brooklyn-based DME Providers to exploit patients for financial gain by billing GEICO and the New York automobile insurance industry millions of dollars in exorbitant charges relating to Fraudulent Equipment purportedly dispensed to Insureds.

### A.    **The DME Providers' Common Secret Ownership**

53.    In furtherance of the fraudulent scheme, the John Doe Defendants conspired with the Paper Owner Defendants and Tsar to implement the integrated scheme in which the DME Providers – though ostensibly separate entities -- were used consecutively over the course of thirteen (13) months to bill GEICO and other New York automobile insurers for millions of dollars of medically unnecessary, illusory, and otherwise non-reimbursable medical equipment (i.e., the "Fraudulent Equipment") dispensed, or purportedly dispensed, to Insureds who were treating at the Clinics.

54.    While each of the DME Providers was formed as medical equipment supply companies and listed as being independently owned by one of the Paper Owner Defendants and Tsar, none of them marketed or advertised to the general public; each lacked any genuine retail or office location; and each operated without any legitimate efforts to attract patients who might need DME and/or OD, or healthcare practitioners who might legitimately prescribe DME and/or OD.

55.    Instead, each of the DME Providers was formed for the purpose of committing fraud and have been controlled by the Secret Owner ( i.e., John Doe Defendant "1"), who has used

the DME Providers to illegally profit from the scheme to submit inflated charges for Fraudulent Equipment to GEICO and other New York automobile-insurers.

56.     The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants and Tsar as a "straw" owner who would place their name on documents needed to be filed with the State of New York and City of New York to ostensibly lawfully operate the DME Providers.

57.     In keeping with the fact that the DME Providers were operated by the Secret Owner as part of a common scheme, the Secret Owner, together with the Paper Owner Defendants and Tsar, operated the DME Providers in the following successive fashion, using each DME Provider Defendant to bill for only three to four months before abruptly ceasing active operations of that DME Provider and moving on to the next DME Provider, without any legitimate explanation beyond avoiding detection of the integrated scheme:

 (i)     Medihealth Supply billed GEICO for dates of service between May 19, 2023 and September 19, 2023;

 (ii)    Zator Supplies billed GEICO for dates of service between September 15, 2023 and December 15, 2023;

 (iii)   AAPS Supply billed GEICO for dates of service between October 30, 2023 and February 23, 2024; and

 (iv)    P&S Equipment billed GEICO for dates of service between February 7, 2024 and June 6, 2024.

58.     In further support of the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants and Tsar to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

59.     For example, the DME Providers dispensed and predominantly billed for many of

the same Fee Schedule and Non-Fee Schedule items. For example, each of the DME Providers purportedly dispensed and billed for the following Fee Schedule items: osteogenesis stimulators under HCPCS E0747, massagers under E1399, custom fit lumbar sacral orthoses under L0632, custom fit shoulder orthoses under HCPCS L3674, cervical collars under L0180, and cervical traction units under HCPCS E0855. Each of the DME Providers also billed for similar Non-Fee Schedule items, such as whirlpools, bed boards, and heat lamps, typically billing these items with charges that indicate they all paid the same exact acquisition cost for each item, notwithstanding the possibility of purchasing these items from numerous different wholesalers and paying numerous different acquisition costs.

60.    Additionally, all bills submitted to GEICO by the purportedly separately owned DME Providers were mailed or faxed to GEICO by a single purported billing and consulting company – R.M.A. Billing & Consulting Inc. ("RMA Billing) -- located in Brooklyn, New York.

61.    Further, each of the DME Provider's billing submissions was largely identical; each of the DME Provider's W-9 Request for Taxpayer Number and Certification listed the same Brooklyn address; and each of the DME Providers used the same collection law firm – Kopelevich & Feldsherova, P.C. – which firm continues to actively seek collection on the fraudulent No-Fault insurance billing on behalf of the DME Providers.

62.    Moreover, as part of the Defendants' efforts to mask the Secret Owner's operation and control of the DME Providers, GEICO attempted to verify the claims submitted by Defendants by way of examinations under oath authorized under the No-Fault insurance regulations, but each of the Paper Owner Defendants refused to appear and provide testimony and/or documents, almost certainly because they would have been unable to answer key questions about the DME Providers' operations and their testimony would reveal the secret ownership scheme.

63.     Finally, and not surprisingly, as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others presently not identifiable but affiliated with the Clinics, the DME Providers each received similar prescriptions for Fraudulent Equipment, often from common multiple Referring Providers in the New York City metropolitan area.

**B.     Overview of Defendants' Multi-Provider DME Scheme**

64.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Providers were used as part of a fraudulent scheme that intentionally targeted the Fraudulent Equipment so they could submit inflated claims for reimbursement to GEICO.

65.     To maximize the amount of No-Fault benefits Defendants could receive, the Secret Owner, along with the Paper Owner Defendants and Tsar, used the DME Providers in successive fashion for only a brief time collecting as much reimbursement as possible, as quickly as possible, before abruptly ceasing active operations of each DME Provider.

66.     Between May 19, 2023 and September 19, 2023, Medihealth Supply submitted more than $344,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $46,500.00, and there is more than $249,000.00 in additional fraudulent claims that have yet to be adjudicated for which the Defendants continue to seek payment from GEICO.

67.     Between September 15, 2023 and December 15, 2023, Zator Supply submitted more than $484,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $43,000.00, and there is more than $223,000.00 in additional fraudulent claims that have yet to be adjudicated for which the Defendants continue to seek payment from GEICO;

68.     Between October 30, 2023 and February 23, 2024, AAPS Supply submitted more

than $368,000 in fraudulent claims to GEICO, has wrongfully obtained more than $73,600.00, and there is more than $213,000.00 in additional fraudulent claims that have yet to be adjudicated for which the Defendants continue to seek payment from GEICO.

69.     Between February 7, 2024 and June 6, 2024, P&S Equipment submitted more than $618,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $141,400.00, and there is more than $428,000.00 in additional fraudulent claims that have yet to be adjudicated for which the Defendants continue to seek payment from GEICO.

70.     The Paper Owner Defendants and Tsar did virtually nothing that would be expected of the owner of a legitimate DME supply company to establish a known business, develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

71.     In fact, the addresses used by the Defendants in the applications submitted to obtain Dealer in Products Licenses from the DCWP for each of the DME Providers were not commercial business locations open to the public. Upon information and belief, no legitimate medical equipment company business operations were conducted at the addresses listed in the respective applications filed with the DCWP.  Specifically:

- Medihealth Supply represented that it conducted its business operations at 2661 Coney Island Avenue, Brooklyn, New York (the "Coney Island Ave Location") for purposes of obtaining a license from DCWP, but the Coney Island Ave Location is a two-story building with a mail drop and money transfer business on the first floor, and residential tenants on the second floor;

- Zator Supplies represented that it conducted its business operations at 604 E 8th Street, Brooklyn, New York (the "8th St. Location") for purposes of obtaining a license from DCWP, but the 8th St. Location is a residential home, with a metal gate;

- AAPS Supply represented that it conducted its business operations at 3203 Quentin Road, Brooklyn, New York (the "Quentin Rd Location") for purposes of obtaining a license from DCWP, but the Quentin Rd Location

is the site of a hardware store, with residential apartments on the second floor; and

- P&S Equipment represented to that it conducted its business operations at 1639 East 13th Street, Brooklyn, New York (the "13th St. Location"), but the 13th St. Location is a three-story residential property with signage for a law firm but no signage indicating the existence of a medical equipment supply company.

72.     In keeping with the fact that the Paper Owner Defendants and Tsar did virtually nothing to establish legitimate medical equipment supply companies, and that the DME Providers had no public-facing businesses or genuine commercial business operations, the Defendants instead entered into unlawful collusive agreements with the Clinics, Clinic Controllers, and Referring Providers in order to steer them to prescribe and direct large volumes of prescriptions to the DME Providers for the specifically targeted Fraudulent Equipment, which equipment was purportedly prescribed and dispensed to treat patients at the Clinics.

73.     The prescriptions obtained by the DME Providers for Fraudulent Equipment were never given to the Insureds to fill, but as part of the scheme, they were routed directly to the DME Providers by the Clinic Controllers to ensure that the Insureds did not fill the prescriptions with legitimate DME and OD retailers.

74.     The prescriptions obtained by the DME Providers for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which the Defendants used to (i) misrepresent the nature and quality of the items intended by the prescriptions; (ii) misrepresent the nature and quality of the items that they actually dispensed, and (iii) misrepresent the maximum reimbursement rate they were entitled to receive – all so as to claim entitlement to higher fees payable by automobile insurers like GEICO than permitted by the No-Fault Laws.

75.     As part of the scheme, the Clinic Controllers directed that the prescriptions issued by the Referring Providers should often be written in a generic, vague, non-descript manner so that

the DME Providers could have the flexibility to designate products that would result in the highest forms of reimbursement from GEICO.

76.     Further, upon information and belief, in many instances the intentionally generic and vague prescriptions were unauthorized by any licensed professional as they were (i) photocopied or otherwise contained duplicated signatures of various Referring Providers; and/or (ii) purportedly issued on dates that the Insureds never treated with the Referring Providers.

77.     The Defendants then used the intentionally generic and vague prescriptions, including at times the unauthorized and photocopied prescriptions, to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds.  As a result, in virtually every circumstance available, the DME Providers purported to provide the Insureds with DME and/or OD that had high – if not one of the highest – maximum reimbursement rates under the DME Fee Schedule.

78.     In addition to unlawfully choosing specific types of Fraudulent Equipment to provide Insureds, each of the DME Providers engaged in a virtually identical pattern of submitting bills to GEICO seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

79.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Providers indicated that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

80.     However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills

submitted by the DME Providers.

81.    Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes for the Fee Scheduled items identified in the bills submitted by the DME Providers.

82.    The Fraudulent Equipment actually provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by Defendants.

83.    In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

84.    In actuality, the bills that the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public. Indeed, the Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality, when the Fraudulent Equipment provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

85.    The Defendants, by purchasing inexpensive and poor-quality Fraudulent Equipment, which they used to fill the generic and vague prescriptions provided by the Clinic Controllers and Referring Providers, executed a scheme to bill GEICO for: (i) Fraudulent

Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds, to the extent any such products were provided at all.

86.    In an effort to hide the extent of their fraudulent acts against GEICO, the Defendants in many cases submitted multiple, separate bills to GEICO for Fraudulent Equipment that was purportedly provided to Insureds on the same date – and which could have more efficiently been billed together on a single bill to GEICO.

87.    The Defendants' submission of multiple bills to GEICO in this manner was designed to further mask the fraudulent scheme and an effort to keep the individual totals on each bill artificially lower to avoid concern and detection by GEICO.

88.    This scheme enabled the Defendants to maximize the amount of No-Fault Benefits they could obtain from GEICO and other New York automobile insurers through the submission of claims for Fraudulent Equipment that were medically unnecessary and provided pursuant to predetermined fraudulent protocols without regard to genuine patient care.

**C.    The Defendants' Collusive Referral Arrangements To Obtain Medically Unnecessary Prescriptions**

89.    As discussed in more detail below, the prescriptions that were provided to the DME Providers were medically unnecessary and the result of predetermined fraudulent protocols between and among the Defendants, the Clinic Controllers (including John Doe Defendants), and the Referring Providers.

90.    To obtain access to the prescriptions and the Insureds, as part of their fraudulent scheme and to maximize the No-Fault Benefits the Defendants could obtain from GEICO and

other New York automobile insurers, the Defendants entered into unlawful financial arrangements with the Clinic Controllers and Referring Providers, including the John Doe Defendants who are not presently identifiable but who are associated with the Clincs where prescriptions for Fraudulent Equipment were provided to the Defendants, in exchange for kickbacks and other financial consideration.

91.    The Referring Providers had no legitimate medical reason to prescribe the Fraudulent Equipment in large quantities to their patients and no legitimate business reason to refer the prescriptions to the DME Providers.

92.    Instead, the Defendants engaged in unlawful financial arrangements to have unnecessary prescriptions, or purported prescriptions, steered to the DME Providers in large quantities in order to allow the Defendants to submit thousands of charges for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

93.    As part of the common scheme, based on the unlawful financial arrangements the DME Providers each received similar medically unnecessary prescriptions for Fraudulent Equipment, often from common multiple Referring Providers.  For example, Medihealth Supply, AAPS Supply, and P&S Equipment each received prescriptions from Gaetan Jean Marie, DNP-FNP ("NP Jean Marie"); (ii) Zator Supplies and AAPS Supply both received prescriptions from Quais Sayeed, D.O. ("Dr. Sayeed); (iii) Medihealth Supply and P&S Equipment both received prescriptions from Natalia Feldman, FNP ("NP Feldman"); and (iv) AAPS Supply and P&S Equipment both received prescriptions from Kimberly Johnson, NP ("NP Johnson").

94.    Upon information and belief, the Referring Providers were compensated from the John Doe Defendants, whether financially or through some other manner, for the Referring Providers' willingness to permit prescriptions issued in their names to be issued to the DME

Providers, rather than given to the Insureds or to a bona-fide DME/OD retailer, which would likely question their legitimacy.

95.     The collusive financial arrangements between the Defendants and the Clinic Controllers and Referring Providers, including the John Doe Defendants, in relation to the prescriptions are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Referring Provider and the DME Providers. In actuality, no such disclosure required by Public Health Law § 238-d was ever provided to the Insureds identified in Exhibits "1" – "4". Rather, because of the nefarious nature of the arrangements, the collusive financial arrangements were concealed from the Insureds.

96.     As a result of the collusive arrangements, the Defendants were given the illegitimate prescriptions which (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii) contained a photocopied signature of the Referring Provider; (iii) were issued on a date the Referring Provider did not treat or otherwise examine the Insured; and/or (iv) were pre-signed/boilerplate with the patient names changed.

97.     The Fraudulent Equipment was then prescribed to Insureds pursuant to predetermined protocols established at each of the Clinics, all of which almost exclusively treated No-Fault patients.

98.     Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons with a "revolving door" of healthcare providers providing treatment to the Insureds and other patients without any continuity of care. These Clinics provide facilities for the Referring Providers, as well as a multitude of other healthcare professional corporations, all geared

towards exploiting New York's No-Fault insurance system.

99.     In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at the Clinics that were the sources of the prescriptions for the Defendants, which providers started and stopped operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

100.    For example, GEICO has received billing for purported healthcare services rendered at: (i) the No-Fault Clinic located at 30-41 Avenue U, Brooklyn, New York (the "Avenue U Clinic"), from a "revolving door" of approximately 100 different healthcare providers; (ii) the No-Fault Clinic located at 82-17 Woodhaven Boulevard, Queens, New York (the "Woodhaven Boulevard Clinic"), from a  "revolving door" of approximately 80 different healthcare providers; and (iii) the No-Fault Clinic located at 87-10 Northern Boulevard, Jackson Heights, New York ("Northern Boulevard Clinic"), from a "revolving door" of approximately 40 different healthcare providers.

101.    Pursuant to the collusive financial arrangements, the Defendants often would pay kickbacks and financial compensation indirectly, including to fictitious businesses, in an effort to conceal the financial arrangements with the Clinic Controllers and Referring Providers. In fact, the Defendants paid thousands of dollars in kickbacks to the John Doe Defendants or to fictitious businesses that existed for no legitimate purpose at the direction of the John Doe Defendants, in order to have prescriptions for the Fraudulent Equipment steered to the DME Providers.

102.    In support of the fact that the Defendants paid thousands of dollars to obtain

prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers, the Defendants utilized the DME Provider's bank accounts to make payments to entities with no legitimate business operations.

103.    For example, as part of the Defendants' collusive financial arrangements with others to obtain prescriptions purportedly issued by the Referring Providers, DME Providers Medihealth Supply and AAPS Supply directed payments to GMO Consulting LLC ("GMO Consulting") for no legitimate purpose.

104.    Between August 2023 and March 2024, Medihealth issued at least twenty separate payments to GMO Consulting for no legitimate purpose, which totaled more than $114,000.00. Each of the checks issued by Medihealth left the memo line blank.

105.    Additionally, between March 2024 and May 2024, AAPS issued at least five separate payments to GMO Consulting for no legitimate purpose, which totaled more than $28,000.00. Each of the checks issued by AAPS left the memo line blank.

106.    In keeping with the fact that the payments by Medihealth and AAPS Supply to GMO Consulting were not for any legitimate purpose, GMO Consulting is registered to a residential address in Manalapan, New Jersey and has no active business operations or internet presence.

107.    GMO Consulting is not a legitimate company. Rather, GMO Consulting's owner Yevsey Tseytelman ("Tseytelman"), has been sued previously for his involvement in a No-Fault fraud scheme in which it was alleged the defendants laundered funds to hide the existence of illegal financial arrangements between participants in No-Fault fraud scheme, including individuals who owned and/or managed No-Fault clinics. See Allstate Insurance Company et al. v. Amirova et al., 1:19-cv-02354(EK)(LB) (E.D.N.Y. 2019).

108.    Tseytelman also invoked his Fifth Amendment privilege against self-incrimination to virtually all questions when deposed in connection with a separate No-Fault insurance fraud action (Gov't Emps. Ins. Co. v. Harbor Medical Group PC , 23-cv-09038 (NCM)(AYS) (E.D.N.Y 2023), including with respect to questions regarding whether GMO Consulting performed any legitimate business services and if GMO Consulting was formed solely to launder money as part of numerous No-Fault insurance schemes.

109.    Moreover, Tseytelman was named as a defendant in Gov't Emps. Ins. Co. v. Leomax Supplies, Inc. et al., 1:19-cv-01236-ENV-RML (E.D.N.Y 2019), for allegedly submitting false and fraudulent billing to GEICO for medically unnecessary DME and engaging in a kickback scheme to defraud GEICO and other New York automobile insurers.

110.    In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

111.    Furthermore, upon information and belief and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from the Defendants.

112.    In all of the claims identified in Exhibits "1" through "4", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and that the DME Providers were therefore entitled to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to collusive financial arrangements and often illegitimate and/or unauthorized.

D. **The Medically Unnecessary Prescriptions and DME Dispensed, or Purportedly Dispensed, to Insureds**

113.     In addition to the collusive financial arrangements, the prescriptions that were provided to the DME Providers were medically unnecessary and the result of predetermined fraudulent protocols between and among the Defendants, the Clinic Controllers and the Referring Providers. The predetermined fraudulent protocols were implemented solely to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

114.     In the claims identified in Exhibits "1" through "4", virtually all the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

115.     In keeping with the fact that many of the Insureds identified in Exhibits "1" through "4" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

116.     To the extent that the Insureds in the claims identified in Exhibits "1" through "4" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

117.     Soft tissue injuries are generally minor, self-limiting conditions.  Recovery from these injuries usually takes place within four to six weeks without significant medical intervention. These conditions respond to adjustment of activities, as well as use of ice and heat, and/or over the counter medication. Maintaining activities is a mainstay of treatment, and most patients are encouraged to walk and resume normal activities as soon as possible.

118.    The prescription of DME/OD is not immediately indicated for the majority of patients with soft tissue injuries.  To the extent DME/OD may be warranted at all for a patient with soft tissue injuries, it is reasonable to allow several weeks for the patient's symptoms to abate before prescribing DME/OD to many patients with soft tissue spine injuries.

119.    Despite virtually all of the Insureds being involved in relatively minor and low impact accidents and only suffering from sprains and strains (to the extent that the Insureds were actually injured), virtually all of the Insureds identified in Exhibits "1" through "4" were prescribed voluminous prescriptions for one or more items of Fraudulent Equipment that was dispensed by the DME Providers, as well as prescriptions for DME/OD dispensed by other medical equipment supply companies.

120.    The Referring Providers issued prescriptions for the voluminous Fraudulent Equipment – including osteogenesis stimulators, custom fit lumbar sacral orthoses, custom fit shoulder orthoses, cervical collars, cervical traction units, massagers, whirlpools, egg crate mattresses, TENS units, bed boards, etc. – that were medically unnecessary and provided pursuant to predetermined fraudulent protocols, without regard for the Insureds' individual presentation or actual medical needs.

121.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the prescriptions for Fraudulent Equipment, described below.

122.    In keeping with the fact that the Fraudulent Equipment was medically unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols solely to maximize the billing, numerous Insureds identified in Exhibits "1" through "4" were purportedly prescribed a "Non-Spinal Osteogenesis Stimulator," which is a device used to help heal *bone fractures* and stimulate bone growth in certain circumstances.

123.    The Defendants then billed GEICO for dispensing the osteogenesis stimulators under HCPCS E0747, resulting in charges of $3,300.00 per Insured who purportedly received the device – even though virtually none of the Insureds who were issued prescriptions for Non-Spinal Osteogenesis Stimulators were diagnosed with a bone fracture.

124.    CMS has published guidance making clear that these devices are medically necessary only in limited instances involving certain bone fractures, typically ones that have ceased healing.  In particular, CMS states as follows:

> A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:
>
> 1.  Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator; or
> 2.  Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery; or
> 3.  Congenital pseudarthrosis.
>
> Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.

A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

See, https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

125.    The Defendants nevertheless billed GEICO more than $264,000.00 for purportedly dispensing medically unnecessary osteogenesis stimulators (or purported osteogenesis stimulators) to many of the Insureds in Exhibits "1" through "4."

126.    In further keeping with the fact that the DME and OD dispensed by the DME Providers was not medically necessary, virtually all of the Insureds identified in Exhibits "1" through "4" that treated at a specific Clinic were issued substantially similar prescriptions for a

predetermined set of Fraudulent Equipment.

127.   While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, in many cases, there were multiple items of Fraudulent Equipment that were purportedly prescribed to nearly all the Insureds identified in Exhibits "1" through "4" regardless which Clinic the Insureds visited.

128.   In fact, the Insured identified in Exhibits "1" through "4" who underwent an initial evaluation was regularly provided with substantially identical Fraudulent Equipment consisting of (i) "Cervical Collar"; (ii) "Cervical Pillow"; (iii) "Bed Board; (iv) Egg Crate Mattress; (v) "Lumbar Sacral Support"; (vi) "Positioning Cushion" a/k/a "Lumbar Cushion"; **and/or** (vi) a "Water Circulating Heat Pad w/ Pump"; **and/or** (vii) a "Thermophore," regardless of the Insured's initial evaluation. In addition, the Referring Providers would also routinely issue one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "Massager"; (ii) "Infrared Lamp"; (iii) "E.M.S Belt"; and (viii) "E.M.S. Unit Four Lead".

129.   In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.  To the extent a healthcare provider prescribes DME/OD, the specific DME/OD prescribed should aid the treatment of the patient and always directly relate to the patients' individual symptoms or presentation.

130.   In determining whether to prescribe DME/OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME/OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME/OD is likely to help improve the patient's complained of condition;

and (iii) whether the patient is likely to use the DME/OD.  In all circumstances, any prescribed DME/OD would always directly relate to each patient's individual symptoms or presentation.

131.    If a healthcare provider determines that DME/OD is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME/OD was prescribed and why.

132.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints and whether there were any barriers to effective use of the prescribed DME. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

133.    Not surprisingly, to the extent that there was a contemporaneously dated evaluation report, the evaluation report often failed to explain – and frequently failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "4".

134.    To the extent the evaluation reports identified and/or referenced the DME/OD identified on the prescriptions provided to the DME Providers, the explanations were perfunctory and non-individualized. In some instances, the DME/OD identified differed from what was purportedly prescribed and dispensed by the DME Providers and/or other non-party DME/OD companies.

135.    Furthermore, when the Insureds continued to seek treatment with the Referring Providers, the follow-up examination reports generated by the Referring Providers often failed to

discuss the Insureds' previously prescribed Fraudulent Equipment, whether the Insureds used the Fraudulent Equipment, or provide any indication whether the Insureds should continue using any of previously prescribed Fraudulent Equipment.

136.    In keeping with the fact that the Fraudulent Equipment was prescribed and dispensed to Insureds without regard to medical necessity, multiple Insureds involved in the same automobile accident would routinely receive prescriptions for several identical items of Fraudulent Equipment, despite being different ages, in different physical conditions, and experiencing the accident in different ways.

137.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact also will affect whether, how, and to what extent an individual is injured in a given automobile accident.

138.    It is improbable – to the point of impossibility – that Insureds involved in the same automobile accidents would routinely receive prescriptions for several identical items of Fraudulent Equipment, despite being different ages, in different physical conditions, and experiencing the accident in different ways.

139.    Nevertheless, the DME Providers routinely received prescriptions for substantially identical DME issued to Insureds involved in the same accident, which DME the DME Providers dispensed without regard to genuine patient care.

140.    For example:

(i)    On May 7, 2023, two Insureds – SG1 and SG2  were involved in the same automobile accident. Thereafter, SG1 and SG2 both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a (i) "Cervical Pillow"; (ii) "Cervical Collar (Hard – 1 Size)"; (iii) "Bed Board"; (iv) "Eggcrate mattress"; (v) "Lumbar Cushion"; (vi) "Lumbar Support

(10" Back Panel)"; and (vii) "Back Massager", all billed to GEICO under the same codes, HCPCS E0190, L0180, E0273, E0184, E2611, L0650, and E1399, respectively, pursuant to virtually identical prescriptions. SG1 and SG2 were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Medihealth Supply.

(ii)     On September 7, 2023, three Insureds – DM, KG, and JM – were involved in the same accident. Thereafter, DM, KG, and JM all presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed an (i) "EMS Belt"; (ii) "EMS Unit"; (iii) "Infrared Lamp"; and (iv) "Massager"; all billed to GEICO under the same codes, HCPCS E0731, E0730, E0205, and E1399, respectively, pursuant to virtually identical prescriptions. DM, KG, and JM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Zator Supplies.

(iii)    On September 21, 2023, two Insureds – TG and MM – were involved in the same automobile accident. Thereafter, TG and MM both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a (i) "Cervical Collar"; (ii) "Positioning Cushion"; (iii) "Bed Board"; (iv) "Egg Crate Mattress"; (v) "Lumbar Orthosis"; (vi) "Water Circ Heat w/ Pump"; (vii) "E.M.S Belt"; (viii) "E.M.S Unit Four Lead"; (ix) "Personal Massager"; (x) "Infrared Lamp"; and (xi) "Whirlpool", all billed to GEICO under the same codes, HCPCS L0180, E2611, E0273, E0184, L0650, E0217, E0731, E0730, E1399, E0205, and E1310, respectively, pursuant to virtually identical prescriptions. TG and MM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Zator Supplies.

(iv)     On August 31, 2023, three Insureds – TSV, FV, and SV – were involved in the same automobile accident. Thereafter, TSV, FV, and SV, all presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a (i) "Cervical Collar"; (ii) "Positioning Cushion"; (iii) "Bed Board"; (iv) "Egg Crate Mattress"; (v) "Lumbar Orthosis"; (vi) "Water Circulating Heat w/

Pump"; (vii) "E.M.S. Belt"; (viii) "E.M.S. Unit Four Lead"; (ix) "Personal Massager"; (x) "Infrared Lamp"; and (xi) "Whirlpool", all billed to GEICO under the same codes, HCPCS L0180, E2611, E0273, E0184, L0650, E0217, E0731, E0730, E1399, E0205, and E1310, respectively, pursuant to virtually identical prescriptions. TSV, FV and SV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Zator Supplies.

(v)     On November 4, 2023, three Insureds – OG, HG, and WDM – were involved in the same automobile accident. Thereafter OG, HG, and DWM all presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a (i) "Cervical Pillow"; (ii) "Cervical Collar"; (iii) "Bed Board/ Egg Crate Mattress"; (iv) "Egg Crate Mattress"; and (v) "Lumbar Sacral Support"; all billed to GEICO under the same codes, HCPCS E0190, L0180, E0273, E0184, and L0650, respectively, pursuant to virtually identical prescriptions. OG, HG, and WDM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by AAPS Supply.

(vi)    On October 11, 2023, two Insureds – HG and KM – were involved in the same automobile accident. Thereafter HG and KM both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed an Osteogenesis Stimulator and waterproof tape, all billed to GEICO under the same codes, HCPCS E0747 and A4452, respectively, pursuant to virtually identical prescriptions. HG and KM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by AAPS Supply.

(vii)   On February 29, 2024, two Insureds – JC and FP – were involved in the same accident. Thereafter, JC and FP both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a (i) "Cervical Pillow"; (ii) "Cervical Collar"; (iii) "Bed Board"; (iv) "Egg Crate Mattress"; (v) "Lumbar Support 10" Back Panel"; (vi) "Lumbar Cushion"; (vii) "Water Circulating Heat Pad w/ Pump"; (viii) right "Shoulder Support";  (ix) left "Shoulder Support"; (x) right "Knee Support"; and (xi)

left "Knee Support", all billed to GEICO under the same codes, HCPCS E0190, L0180 E0273, E0184, L0650, E2611, E0217, L3670, and L1831, respectively, pursuant to virtually identical prescriptions. JC and FP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by P&S Equipment.

(viii)   On March 18, 2024, two Insureds – DG and MZ – were involved in the same accident. Thereafter, DG and MZ both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a (i) "Cervical Pillow"; (ii) "Cervical Collar"; (iii) "Bed Board/ Egg Crate Mattress"; (iv) "Egg Crate Mattress"; and (v) "Lumbar Sacral Support", all billed to GEICO under the same codes, HCPCS E0190, L0180, E0273, E0184, and L0650, respectively, pursuant to virtually identical prescriptions. DG and MZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by P&S Equipment.

(ix)   On April 21, 2023, two Insureds – LG and LL – were involved in the same automobile accident. Thereafter, LG and LL both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed an Osteogenesis Stimulator and waterproof tape, all billed to GEICO under the same codes, HCPCS E0747 and A4452, respectively, pursuant to identical prescriptions. LG and LL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Medihealth Supply.

(x)   On January 19, 2024, two Insureds – JP and GZ – were involved in the same automobile accident. Thereafter, JP and GZ all presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed an Osteogenesis Stimulator and waterproof tape, all billed to GEICO under the same codes, HCPCS E0747 and A4452, respectively, pursuant to virtually identical prescriptions. JP and GZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident,

their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by P&S Equipment.

141. These are only representative examples.

142. The standard of care for patients involved in automobile accidents does not include the routine prescribing of voluminous, often identical, predetermined sets of medical equipment, such as a Cervical Collar, Positioning Cushion, Bed Board, Egg Crate Mattress, Lumbar Orthosis, Water Circulating Heat w/ Pump, E.M.S Belt, Personal Massager, Infrared Lamp, Whirlpool, and similar items of equipment, often along with an osteogenesis stimulation device.

143. In support of the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibits "1" through "4" were for medically unnecessary Fraudulent Equipment, and obtained as part of a predetermined fraudulent protocol, at times, the prescriptions filled by the DME Providers were purportedly issued on dates that the Insureds never were treated by the Referring Providers.

144. For example:

(i)     Insured MD was allegedly involved in a motor vehicle accident on July 6, 2023. On August 2, 2023, Medihealth Supply purportedly provided MD with a (i) "Cervical Pillow"; (ii) "Cervical Collar (2 PC)"; (iii) "Lambar-Sacral [sic] Orthosis Sagital [sic] Control"; (iv) "Bed Board"; and (v) "Egg Crate Mattress", pursuant to prescriptions purportedly issued by NP Jean Marie on July 10, 2023, *when NP Jean Marie did not examine or otherwise treat MD on July 10, 2023.*

(ii)    Insured JC was allegedly involved in a motor vehicle accident on July 7, 2023. On August 15, 2023, Medihealth Supply purportedly provided JC with a "Shoulder Custom Fitted (Right)" pursuant to a prescription purportedly issued by Abdalla Adam, M.D. ("Dr. Adam") on August 7, 2023, *when Dr. Adam did not examine or otherwise treat JC on August 7, 2023.*

(iii)   Insured DV was allegedly involved in a motor vehicle accident on April 24, 2023. On August 3, 2023, Medihealth Supply purportedly provided DV with a "K.O. Rigid Adj. Custom Fitted (Right)" pursuant to a prescription purportedly issued by NP Jean Marie on July 26, 2023, *when NP Jean Marie*

*did not examine or otherwise treat DV on July 26, 2023*.

(iv)     Insured TKM was allegedly involved in a motor vehicle accident on June 16, 2023. On September 20, 2023, Zator Supplies purportedly provided TKM with a (i) "Lumbar Cushion"; (ii) "Cervical Pillow"; (iii) "Lumbar Support", (iv) "Bed Board", (v) "Shoulder Orthosis R/L" (vi) "Egg Crate Mattress"; (vii) "Electric Heat Pad"; (viii) "Massager"; and (ix) "T.E.N.S Unit",  pursuant to prescriptions purportedly issued by Scott Lyons, PA ("PA Lyons") on August 30, 2023, *when PA Lyons did not examine or otherwise treat TKM on August 30, 2023.*

(v)     Insured TS was allegedly involved in a motor vehicle accident on September 14, 2023. On October 10, 2023, Zator Supplies purportedly provided TS with a (i) "Positioning Cushion"; (ii) "Lumbar Sacral Support"; (iii) "Bed Board";  (iv) "Egg Crate Mattress"; (v) "Cervical Collar"; (vi) "Cervical Pillow"; (vii) "Shoulder Orthosis (Right)"; (viii) "Knee Orthosis, Adjustable, Custom Fitted (Right)"; (ix) "Infra Red Lamp"; (x) "Massager"; (xi) "E.M.S Unit"; and (xii) "E.M.S Belt", pursuant to prescriptions purportedly issued by Yledede Mimi Cummings, NP ("NP Cummings") on September 18, 2023, *when NP Cummings did not examine or otherwise treat TS on September 18, 2023.*

(vi)     Insured FF was allegedly involved in a motor vehicle accident on August 30, 2023. On November 13, 2023, AAPS Supply purportedly provided FF with an "LSO APL Control/Custom Fitted" and "Cervical Traction Set", pursuant to prescriptions purportedly issued by NP Jean Marie on October 27, 2023, *when NP Jean Marie did not examine or otherwise treat FF on October 27, 2023.*

(vii)     Insured RC was allegedly involved in a motor vehicle accident on February 3, 2024. On April 8, 2024, P&S Equipment purportedly provided RC with an "LSO APL Control/Custom Fitted" pursuant to a prescription purportedly issued by NP Feldman on March 27, 2024, *when NP Feldman did not examine or otherwise treat RC on March 27, 2024.*

(viii)     Insured KC  was allegedly involved in a motor vehicle accident on February 3, 2023. On May 15, 2024, P&S Equipment purportedly provided KC with an (i) "E.M.S Unit (4Lead)"; (ii) "Infrared Lamp (heat lamp w/stand)"; (iii) "Massager"; and (iv) "Hydrotherapy Whirlpool", pursuant to prescriptions purportedly issued by NP Feldman on April 25, 2024, *when NP Feldman did not examine or otherwise treat KC on April 25, 2024.*

(ix)     Insured JN was allegedly involved in a motor vehicle accident on January 13, 2024. On April 29, 2024, P&S Equipment purportedly provided JN with a "Cervical Traction Set" pursuant to a prescription purportedly issued by NP Jean Marie on March 12, 2024, *when NP Jean Marie did not examine or otherwise treat JN on March 12, 2024.*

145.    Further, to the extent that there was a contemporaneously dated evaluation report, the evaluation report often failed to explain – and frequently failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "4".

146.    To the extent the evaluation reports identified and/or referenced the DME/OD identified on the prescriptions provided to the DME Providers, the explanations were perfunctory and non-individualized. In some instances, the DME/OD identified differed from what was purportedly prescribed and dispensed by the DME Providers and/or other non-party DME companies.

147.    Furthermore, when the Insureds continued to seek treatment with the Referring Providers, the follow-up examination reports generated by the Referring Providers often failed to discuss the Insureds' previously prescribed Fraudulent Equipment, whether the Insureds used the Fraudulent Equipment, or provide any indication whether the Insureds should continue using any of previously prescribed Fraudulent Equipment.

148.    Plainly, the Fraudulent Equipment dispensed by the DME Providers were medically unnecessary and provided without regard for genuine patient care. In fact, there were often significant delays between the date on which the prescription was issued and the date on which the Fraudulent Equipment was delivered to the Insured, demonstrating the lack of any genuine medical need for the DME/OD.

149.    For example:

(i)    Insured LS was allegedly involved in a motor vehicle accident on July 23, 2023. Thereafter, LS sought treatment with Nicole Brown, ANP ("NP Brown") at a No-Fault Clinic located at 2182 Flatbush Avenue, Brooklyn, NY (the "Flatbush Avenue Clinic"). On July 25, 2023, NP Brown purportedly issued prescriptions to LS for an (i) "Orthopedic Car Seat"; (ii) "Cervical Collar Adjustable"; (iii) "LSO (Lumbosacral back support)"; (iv)

"Water Circulation Unit"; (v) "Foam (Egg Crate) Mattress"; and (vi) "Bed Board", which were delivered to LS by Medihealth Supply *nearly one month later,* on August 21, 2023.

(ii)　Insured ARB was allegedly involved in a motor vehicle accident on July 6, 2023. Thereafter, ARB sought treatment with NP Jean Marie at the Northern Boulevard Clinic. On July 10, 2023, NP jean Marie purportedly issued prescriptions to ARB for a (i) "Lumber [sic] Sacral Support"; (ii) "Bed Board/Egg Crate Mattress"; (iii) "Egg Crate Mattress"; (iv) "Cervical Collar"; and (v) "Cervical Pillow", which were delivered to ARB by Medihealth Supply *over three weeks later* on August 2, 2023.

(iii)　Insured ER was allegedly involved in a motor vehicle accident on October 18, 2023. Thereafter, ER sought treatment with Wei Hong Xu, NP ("NP Xu") at a No-Fault Clinic located at 32-09 Fulton Street, Brooklyn, NY (the "Fulton Street Clinic"). On October 19, 2023, NP Xu purportedly issued a prescription to ER for a (i) "Cervical Pillow"; (ii) "Lumbar Cusion [sic]"; (iii) "Lumbar Sacral Support"; (iv) "Bed Board"; (v) "Edd [sic] Crate Mattress"; (vi) "Cervical Collar"; (vii) "Shoulder Support- Right"; and (viii) "Knee Brace- Right", which were delivered to ER by Zator Supplies *nearly one month later,* on November 16, 2023.

(iv)　Insured AR was allegedly involved in a motor vehicle accident on July 21, 2023. Thereafter, AR sought treatment with Jean-Pierre Barakat, M.D. ("Dr. Barakat") at a No-Fault Clinic located at 441 Willis Avenue, 2nd Floor, Bronx, NY. On September 7, 2023, Dr. Barakat purportedly issued prescriptions to AR for an (i) "LSO w/APL Control Custom Fitted"; (ii) "Cervical Traction w Pump"; (iii) "Elbow Support Right"; and (iv) "Right Shoulder Support", which were delivered to AR by Zator Supplies *nearly one month later* October 6, 2023.

(v)　Insured LM was allegedly involved in a motor vehicle accident on October 12, 2023. Thereafter, LM sought treatment with Dorothie Belgarde, FNP-BC ("NP Belgarde") at the Woodhaven Boulevard Clinic. On October 18, 2023, NP Belgarde purportedly issued prescriptions to LM for a (i) "Lumbar Sacral Support"; (ii) "Bed Board/Egg Crate Mattress"; (iii) "Egg Crate Mattress"; (iv) "Cervical Collar"; and (v) "Cervical Pillow", which were delivered to LM by AAPS Supply *over three weeks later* on November 9, 2023.

(vi)　Insured BD was allegedly involved in a motor vehicle accident on February 5, 2024. Thereafter, BD sought treatment with NP Johnson at the Woodhaven Clinic. On March 18, 2024, NP Johnson purportedly issued prescriptions to BD for an (i) "Infrared Lamp"; (ii) "Personal Massager"; (iii) "E.M.S. Unit Four Lead"; and (iv) "E.M.S. Belt", which were delivered to BD by P&S Equipment *nearly one month later* on April 16, 2024.

(vii)   Insured DD was allegedly involved in a motor vehicle accident on January 13, 2024. Thereafter, he sought treatment with NP Jean Marie at the Northern Boulevard Clinic. On January 16, 2024, NP Jean Marie purportedly issued prescriptions to DD for a (i) "Lumber [sic] Sacral Support"; (ii) "Bed Board/Egg Crate Mattress"; (iii) "Egg Crate Mattress"; (iv) "Cervical Collar"; and (v) "Cervical Pillow", which were delivered to DD by P&S Equipment *over one month later* on February 20, 2024.

150.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" through "4", the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME/OD, and were therefore entitled to collect No-Fault Benefits in the first instance, when, in reality the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant to unlawful financial agreements.

### E. The Defendants' Misrepresented the Medical Equipment Purportedly Provided and Inflated the Charges to GEICO

151.    The bills submitted to GEICO by the Defendants also misrepresented the type of Fraudulent Equipment provided, to the extent any Fraudulent Equipment was provided, and did not match the HCPCS Codes identified in the bills to GEICO.

152.    When the Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

(i)    Fee Schedule Items of DME and OD

153.    As indicated above, the DME Fee Schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

154.    Additionally, Palmetto provides specific characteristics and requirements that

DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for Fee Schedule items, as well as Non-Fee Schedule items.

155.    By submitting bills to GEICO containing specific HCPCS Codes and charges, Defendants represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

156.    However, in many of the claims for Fraudulent Equipment identified in Exhibits "1" through "4", when Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

157.    As indicated above, it was part of the unlawful financial arrangements and predetermined protocols to allow the DME Providers to maximize the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

158.    Accordingly, to the extent the prescriptions were actually authorized in the first place, the Clinic Controllers and Referring Providers purposefully provided prescriptions to the Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

159.    Based upon the vague and generic prescriptions that the Defendants received, the Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

160.    As part of their common scheme, although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants often billed GEICO – and likely other New York automobile insurers – using HCPCS Codes that contained one of the

higher reimbursement amounts, and did so for their financial benefit.

161.    However, despite billing for Fraudulent Equipment using HCPCS Codes that had one of the higher reimbursement amounts, to the extent that the Defendants provided any of the Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO often severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

162.    For example, in the claims identified in Exhibits "1" through "4", whenever there was basic checklist prescription form for an LSO, the Defendants never contacted the Referring Provider to request clarification. Instead, the Defendants made their own unilateral determination as to which unique item to provide each Insured.

163.    Furthermore, in each circumstance where the basic checklist prescription forms allowed the DME Providers to choose a unique LSO, the Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with, the type of LSO that resulted in a high – or one of the highest – maximum reimbursable amounts under the Medicaid Fee Schedule.

164.    Specifically, in many of the prescriptions issued to the Defendants that are part of the claims identified in Exhibit "1" through "4" the prescriptions were issued on basic checklist prescription forms requesting that the Defendants provide a "Lumbar-Sacral Orthosis" "Lumbar Support", "Lumbar Orthosis", or "LSO", without any further specification.

165.    The Defendants intentionally used basic checklist prescription forms with generic language so that they could purportedly provide the Insureds with the type of LSO that resulted in one of the highest maximum reimbursable amounts under the Medicaid Fee Schedule.

166.    This generic language in the basic checklist prescription forms from the Referring Providers for the LSOs directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds,

including but not limited to:

(i)     HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)   HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)     HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)     HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a

maximum reimbursement rate of $1,036.35.

(xiii)  HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)  HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xv)  HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)  HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)  HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)  HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)  HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)  HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)  HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii)  HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

167.    As non-professional laypersons, the DME Providers and the other Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had a basic checklist prescription for a "Lumbar-Sacral Orthosis (LSO)."

168.    Nevertheless, the Defendants frequently submitted charges of $1,150.00 using HCPCS Code L0632 pursuant to the basic checklist prescriptions, which is on the higher end of the maximum reimbursable amounts out of the multiple LSOs identified in the Medicaid Fee Schedule.

169.    The Defendants also submitted charges of $741.59 or $759.92 using HCPCS Code L0650 pursuant to the basic checklist prescriptions, which is also one of the more expensive LSOs identified in the DME Fee Schedule.

170.    In many of the claims for Fraudulent LSOs identified in Exhibit "1" through "4" the Defendants unilaterally decided the unique type of LSO to purportedly provide Insureds without any legal authority to do so or any clarification from the Referring Provider.

171.    In addition to unilaterally deciding the unique type of LSO to purportedly provide Insureds based on basic checklist prescription forms, the Defendants intentionally misrepresented that the LSOs that they billed under certain HCPCS Codes were "custom fabricated" in order to inflate the fraudulent charges they could submit to GEICO through the DME Providers and maximize their ill-gotten gains

172.    For example, the DME Providers billed GEICO approximately $200,000.00 for purportedly dispensing LSOs under HCPCS Code L0632 to Insureds identified in Exhibits "1" to "4", which are LSOs that are required to be "custom fabricated" (i.e., custom-constructed) from various raw materials for a specific patient.

173.    A "custom fabricated" LSO is one that is individually made for a specific patient.

No other patient would be able to use the same LSO. A custom fabricated LSO is a device constructed using "clinically derived and rectified castings, tracings, measurements," and/or imaging of the relevant body part(s). The process "requires the use of materials including but not limited to plastics, metals, leather, or cloth in the form of uncut or unshaped sheets," and involves "substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling, and finishing prior to fitting on the patient." See CMS, Spinal Orthoses: TLSO and LSO Policy Article.

174.    In essence, a custom-fabricated LSO is created and manufactured from scratch for use by a specific patient.

175.    In the claims identified in Exhibit "1" through "4" for custom-fabricated LSOs, including the claims for HCPCS Code L0632, the Defendants fraudulently misrepresented that the Defendants provided the Insureds with LSOs that were custom fabricated as described by the CMS policy article, i.e. a certified orthotist took detailed measurements of an Insured and constructed an individualized LSO that uniquely fits that Insured only, to the extent that any LSOs were actually provided to the Insureds.

176.    Similarly, the DME Providers billed GEICO approximately $173,000.00 for purportedly dispensing Shoulder Supports under HCPCS Code L3674, based on charges of $896.92 for each Shoulder Support. Shoulder Supports billed under HCPSC Code L3674 are required to be "custom fabricated" (i.e., custom-constructed) from various raw materials for a specific patient.

177.    Similar to the charges for LSOs, the phrase "Shoulder Support" applies to 8 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.  Yet, the Defendants fraudulently submitted charges to GEICO that reflect a custom-fabricated shoulder support, purportedly created

and manufactured from scratch for use by a specific Insured.

178.    The Defendants also fraudulently misrepresented the nature and type of other Fee Schedule items purportedly provided to Insureds .

179.    For example, as identified in Exhibits "1" through "4" the DME Providers billed GEICO approximately $112,000.00 for purportedly dispensing "Cervical Traction" devices to Insureds, regularly submitting charges for $502.63 under HCPCS Code E0855.  However, the phrase "Cervical Traction" applies to over 5 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds – including cheap devices that have reimbursable amounts of $21.36.

180.    Similarly, as previously mentioned and identified in Exhibits "1" through "4," the DME Providers billed GEICO approximately $270,000.00 for purportedly dispensing osteogenesis stimulators under HCPCS Code E0747, with a charge of $3,300.00 per device, based upon prescriptions for a "Osteogenesis Stimulator".  As noted above, however, an osteogenesis stimulator is device used in limited situations to help heal bone fractures and stimulate bone growth and is typically an expensive piece of equipment.

181.    In reality, despite billing GEICO and other New York automobile insurers using HCPCS Code E0747, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for an osteogenesis stimulator – did not comport with the requirements of E0747 and were cheap and poorly made devices that were not reimbursable at $3,300.00 per unit.

182.    The claims identified in Exhibits "1" through "4" for HCPCS Code E2611 are another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually

provided – as part of their common scheme.

183.    Each of the claims identified within Exhibits "1" through "4" for HCPCS Code E2611 contained a charge for $282.40 based upon prescriptions for a "General Use Cushion".

184.    However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

185.    Despite billing GEICO and other New York automobile insurers using HCPCS Code E2611, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair.

186.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" through "4" who were provided with a cushion by the Defendants that was billed to GEICO under HCPCS Code E2611, were in a wheelchair.

187.    In virtually all of the claims for Fraudulent Equipment identified in Exhibits "1" through "4" that are based upon vague and generic language in prescriptions provided by the Referring Providers, the Defendants decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

188.    The Defendants' misrepresentations regarding the Fee Schedule items billed to GEICO inflated the charges submitted to GEICO and resulted in the DME Providers obtaining payment from GEICO under the New York No-Fault Laws to which the DME Providers were never entitled.

(ii)    Non-Fee Schedule Items of DME and OD

189.    In those instances when the DME Providers submitted bills to GEICO for Non-Fee Schedule items, the DME Providers requested reimbursement rates that purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

190.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

191.    By submitting bills to GEICO for Non-Fee Schedule items, the Defendants fraudulently represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

192.    Instead, the DME Providers submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of the Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.  For example:

- **Whirlpools** – The DME Providers billed GEICO more than $65,000.00 for purported "built-in" whirlpools, with each DME Provider systematically submitting charges of $424.00 per whirlpool.  If the DME Providers billed 150% of their acquisition cost, this would mean that each of the DME Providers paid $282.66 per whirlpool.  However, none of the DME Providers submitted any wholesale invoice substantiating their acquisition cost or any other information supporting their charges GEICO.  In reality, the DME Providers likely never paid more than a small fraction of the amount billed to GEICO and likely dispensed, to the extent they dispensed anything at all, cheap, inexpensive portable whirlpool devices for bathtubs that are available to the public for a small fraction of the $424.00 billed to GEICO

- **Heat Lamps** -- The DME Providers billed GEICO more than $78,000.00 for purported heat lamps with stands, with each DME Provider systematically submitting charges of either $253.50 or 210.00 per heat lamp.  If the DME Providers billed 150% of their acquisition cost, this would mean that each of the

DME Providers paid $169.00 per lamp. However, none of the DME Providers submitted any wholesale invoice substantiating their acquisition cost or any other information supporting their charges GEICO. In reality, the DME Providers likely never paid more than a small fraction of the amount billed to GEICO and likely dispensed, to the extent they dispensed anything at all, cheap, heat wands that are available to the public for small fraction of the $253.50 billed to GEICO.

- **Bed Boards** -- The DME Providers billed GEICO more than $38,000.00 for purported bed boards, with each DME Provider systematically submitting charges of $101.85 per bed board. If the DME Providers billed 150% of their acquisition cost, this would mean that each of the DME Providers paid $67.90 per bed board. However, none of the DME Providers submitted any wholesale invoice substantiating their acquisition cost or any other information supporting their charges GEICO. In reality, the DME Providers likely never paid more than a small fraction of the amount billed to GEICO and likely dispensed, to the extent they dispensed anything at all, cheap, inexpensive, cardboard bed boards that are available to the public for small fraction of the $101.85 billed to GEICO.

193.    The DME Providers were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment, for which the acquisition cost was low.

194.    In keeping with the fact that the DME Providers fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills and refusing to appear for examinations under oath requested by GEICO in an effort to verify the validity of the claims submitted under the names of the DME Providers.

195.    The DME Providers did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were

significantly less than the charges contained in the bills.

196.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" through "4" virtually always misrepresented the permissible reimbursement amount.

197.    The Defendants' misrepresentations regarding Non-Fee Schedule items inflated the charges submitted to GEICO and resulted in the DME Providers obtaining payment from GEICO under the New York No-Fault Laws to which the DME Providers were never entitled.

**F.    The DME Providers' Sham Licensing**

198.    As stated above, for a DME supplier to provide DME or OD to automobile accident victims within the City of New York, the DME supplier must obtain a Dealer in Products License by the DCWP.

199.    For Defendants to lawfully provide DME or OD to the Insureds identified in Exhibits "1" through"4", the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "4" were located within the City of New York.

200.    As part of the Defendants' scheme to defraud GEICO and other Insurers, the Defendants sought Dealer in Products Licenses from the DCWP in an effort to have the DME Providers appear to be legitimate suppliers of DME/OD. However, the DME Providers were not legitimate companies, lawfully licensed by the DCWP to provide DME or OD to Insureds, as they obtained Dealer in Products licenses through fraud and/or misrepresentations.

201.    As part of obtaining a Dealer in Products License, each of the Paper Owner Defendants completed a license application on behalf of their respective DME Provider that required them to identify – among other things – all owners of the DME Provider and the

commercial address of where the DME Provider physically operated from.

202.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

203.    However, in each of the applications for a Dealer in Products license completed by the Paper Owner Defendants on behalf of the DME Providers, the Paper Owner Defendants falsely affirmed that the DME Providers operated or conducted business from the address listed in the respective applications when, in fact, no legitimate medical equipment company business operations or commercial space open to the public existed at those locations for any of the DME Providers.

204.    Further, each of the Paper Owner Defendants (and Tsar) affirmed on their license applications, under penalty for false statements, that they were the sole owner of each respective DME Provider. In reality, as set forth above, the DME Providers were actually controlled by the Secret Owner, who directly profited from the fraudulent scheme committed through the DME Provider.

205.    The Paper Owner Defendants and Tsar knowingly provided false information regarding their ownership, along with the location of their commercial, business operations, to induce the DCWP to issue licenses to them, which would give the Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers through the DME Providers.

206.    Accordingly, the Defendants were never entitled to receive No-Fault Benefits because they failed to comply with significant licensing requirements by operating as DME/OD suppliers within the City of New York without a valid, legitimately obtained Dealer in Products License, as the licenses associated with the DME Providers were obtained under false pretenses.

### G.    The Fraudulent Billing the DME Providers Submitted or Caused to be Submitted to GEICO

207.    To support their fraudulent charges, the DME Providers systematically submitted or caused to be submitted hundreds of NF-3 forms, and/or treatment reports to GEICO through and in the name of the DME Providers, seeking payment for the Fraudulent Equipment.

208.    The NF-3 forms, and treatment reports that the DME Providers submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits.  In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits.  In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment (a) based on prescriptions secured through collusive arrangements with the John Doe Defendants, and (b) based on prescriptions that were unauthorized or otherwise illegitimate;

(iii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits.  In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items;

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly represented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and/or represented that the reimbursement rate sought was consistent with the No-Fault regulations, and therefore they were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms and was otherwise billed with fraudulently inflated charges; and

(v)    the NF-3 forms, and prescriptions uniformly misrepresented to GEICO that the DME Providers were lawfully operating and provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Providers provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their application for a Dealer for Products Licenses.

209.    As a direct result of the Defendants' scheme, and in reliance on the fraudulent billing submissions made through the DME Providers, GEICO was led to voluntarily issue payments to the Defendants totaling approximately $303,325.61.

## III.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

210.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD o Insureds, and their actual submission of charges to GEICO.

211.    To induce GEICO to promptly pay the charges for Fraudulent Equipment, the Defendants have gone to great lengths to systematically conceal their fraud.

212.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants),

without regard for genuine patient care.

213.    The Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were not based upon medical necessity but rather were based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided directly to the DME Providers without the involvement of Insureds, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

214.    Furthermore, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME, and not by an actual healthcare provider's prescription for medically necessary DME, in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

215.    Further, the Defendants knowingly misrepresented the permissible reimbursement amount of the Fraudulent Equipment contained in the bills submitted by the DME Providers to GEICO in order to prevent GEICO from discovering that items were billed with inflated charges to GEICO for financial gain.

216.    Finally, the Defendants knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Providers to obtain a Dealer in Products License from the DCWP because they falsely concealed in the application for a Dealer in Products License, under penalty for false statements, the Secret Owner's ownership interest for each of the DME Providers and misrepresented the business address for each of the DME Providers in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO as part of a coordinated scheme for financial gain.

217.    The billing and supporting documentation submitted by the DME Providers, when viewed in isolation, did not reveal its fraudulent nature.

218.    GEICO attempted to verify the claims via examinations under oath for which the Defendants failed to appear.

219.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file numerous individual, expensive and time-consuming collection proceedings, in piece-meal fashion, against GEICO and other insurers if the charges are not promptly paid in full, all as part of the scheme and to monetize the Defendants' fraudulent activity as quickly as possible. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the DME Providers have been engaged in fraud.

220.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of No-Fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

221.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them.  As

a result, GEICO incurred damages of more than $305,000.00 based upon the fraudulent charges.

222.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the DME Providers
**(Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment)**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

223.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

224.    There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $1.8 million in fraudulent billing that has been submitted to GEICO in the names of DME Providers.

225.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

226.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and which were unauthorized or otherwise illegitimate.

227.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Equipment purportedly provided by the DME Providers and

purportedly to Insureds was a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

228.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers actually provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to inflate the reimbursement rate and otherwise fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

229.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants did not comply with material licensing laws as the DME Providers falsified the identities of the corporate owners and their business addresses on the applications for Dealer in Products Licenses, and thus, were not lawfully licensed by the DCWP as required by regulations from the City of New York.

230.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

231.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

232.    Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is

defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

233.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

234.    The DME Provider Enterprise operated under multiple separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

235.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from

insurance companies to support all of the aforesaid functions.

236.    Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis, seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were unauthorized or otherwise illegitimate; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (iv) the extent that any Fraudulent Equipment was actually provided, the bills for the Fraudulent Equipment misrepresented the type of Fraudulent Equipment and fraudulently inflated the charges to GEICO well above the maximum permissible reimbursement amounts; and (v) the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License.

237.    The fraudulent billings and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "4".

238.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME provider, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

239.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues both submit fraudulent billing to GEICO and attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $305,000.00 pursuant to the fraudulent bills submitted by the Defendants through the DME Providers Enterprise.

240.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

241.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

242.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

243.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

244.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: because (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were unauthorized or otherwise illegitimate; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (iv) the extent

that any Fraudulent Equipment was actually provided, the bills for the Fraudulent Equipment misrepresented the type of Fraudulent Equipment and fraudulently inflated the charges to GEICO well above the maximum permissible reimbursement amounts; and (v) the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License.

245.    The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "4".

246.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

247.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $305,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

248.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Medihealth Supply, Gorelik, and John Doe Defendant "1"**
**(Common Law Fraud")**

249.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

250.    Mediehealth Supply, Gorelik, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

251.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it as dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, the representation that the Fraudulent Equipment dispensed was based upon a legitimate prescriptions from a licensed healthcare provider when, in fact, the Fraudulent Equipment was dispensed as a result of unlawful financial arrangements and based on prescriptions that were unauthorized or otherwise illegitimate; (iii) in virtually all claims, to the extent that any Fraudulent Equipment was actually provided, the representation that the reimbursement rate for the Fraudulent Equipment were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (iv) in every claim, the representation that Medihealth Supply had a lawful Dealer in Products Licenses and was entitled to No-Fault Benefits when in fact Medihealth Supply was not lawfully licensed as the Defendants knowingly falsified the business owner and operating address information on the application for a Dealer in Products License.

252.    Medihealth Supply, Gorelik, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Medihealth Supply that were not compensable

under New York no-fault insurance laws.

253.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $46,500.00 pursuant to the fraudulent bills submitted by Medihealth Supply, Gorelik, and John Doe Defendant "1".

254.    The extensive fraudulent conduct of Medihealth Supply, Gorelik, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

255.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Medihealth Supply, Gorelik, and John Doe Defendant "1"**
**(Unjust Enrichment)**

256.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

257.    As set forth above, Medihealth Supply, Gorelik, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

258.    When GEICO paid the bills and charges submitted by or on behalf of Medihealth Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

259.    Medihealth Supply, Gorelik, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Medihealth Supply, Gorelik, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper,

unlawful, and unjust billing scheme.

260.    Medihealth Supply, Gorelik, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

261.    By reason of the above, Medihealth Supply, Gorelik, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $46,500.00.

### SIXTH CAUSE OF ACTION
**Against Zator Supplies and John Doe Defendant "1"**
**(Common Law Fraud")**

262.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

263.    Zator Supplies and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

264.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it as dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, the representation that the Fraudulent Equipment dispensed was based upon a legitimate prescriptions from a licensed healthcare provider when, in fact, the Fraudulent Equipment was dispensed as a

result of unlawful financial arrangements and based on prescriptions that were unauthorized or otherwise illegitimate; (iii) in virtually all claims, to the extent that any Fraudulent Equipment was actually provided, the representation that the reimbursement rate for the Fraudulent Equipment were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (iv) the representation that Zator Supplies had a lawful Dealer in Products Licenses and was entitled to No-Fault Benefits when in fact Zator Supplies was not lawfully licensed as the Defendants  knowingly falsified the business owner and operating address information on the application for a Dealer in Products License.

265.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $43,300.00 pursuant to the fraudulent bills submitted by Zator Supplies and John Doe Defendant "1".

266.    The extensive fraudulent conduct of Zator Supplies and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

267.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Zator Supplies and John Doe Defendant "1"**
**(Unjust Enrichment)**

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

269.    As set forth above, Zator Supplies and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

270.    When GEICO paid the bills and charges submitted by or on behalf of Zator Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

271.    Zator Supplies and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Zator Supplies and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

272.    Zator Supplies and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

273.    By reason of the above, Zator Supplies and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $43,300.00.

## EIGHT CAUSE OF ACTION
### Against AAPS Supply, Rader, and John Doe Defendant "1"
### (Common Law Fraud")

274.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

275.    AAPS Supply, Rader, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

276.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it as dispensed pursuant

to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, the representation that the Fraudulent Equipment dispensed was based upon a legitimate prescriptions from a licensed healthcare provider when, in fact, the Fraudulent Equipment was dispensed as a result of unlawful financial arrangements and based on prescriptions that were unauthorized or otherwise illegitimate; (iii) in virtually all claims, to the extent that any Fraudulent Equipment was actually provided, the representation that the reimbursement rate for the Fraudulent Equipment were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (iv) the representation that AAPS Supply had a lawful Dealer in Products Licenses and was entitled to No-Fault Benefits when in fact AAPS Supply was not lawfully licensed as the Defendants  knowingly falsified the business owner and operating address information on the application for a Dealer in Products License.

277.    AAPS Supply, Rader, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through AAPS Supply that were not compensable under New York no-fault insurance laws.

278.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $73,600.00 pursuant to the fraudulent bills submitted by AAPS Supply, Rader, and John Doe Defendant "1".

279. AAPS Supply, Rader, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

280. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**AAPS Supply, Rader, and John Doe Defendant "1"**
**(Unjust Enrichment)**

281. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

282. As set forth above, AAPS Supply, Rader, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

283. When GEICO paid the bills and charges submitted by or on behalf of AAPS Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

284. AAPS Supply, Rader, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that AAPS Supply, Rader, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

285. The retention of GEICO's payments by AAPS Supply, Rader, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

286. By reason of the above, AAPS Supply, Rader, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $73,600.00.

## TENTH CAUSE OF ACTION
### Against P&S Equipment, Kupina, and John Doe Defendant "1"
### (Common Law Fraud")

287.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

288.    P&S Equipment, Kupina, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

289.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it as dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, the representation that the Fraudulent Equipment dispensed was based upon a legitimate prescriptions from a licensed healthcare provider when, in fact, the Fraudulent Equipment was dispensed as a result of unlawful financial arrangements and based on prescriptions that were unauthorized or otherwise illegitimate; (iii) in virtually all claims, to the extent that any Fraudulent Equipment was actually provided, the representation that the reimbursement rate for the Fraudulent Equipment were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (iv) the representation that P&S Equipment had a lawful Dealer in Products Licenses and was

entitled to No-Fault Benefits when in fact P&S Equipment Supply was not lawfully licensed as the Defendants knowingly falsified the business owner and operating address information on the application for a Dealer in Products License. .

290.    P&S Equipment, Kupina, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through P&S Equipment that were not compensable under New York no-fault insurance laws.

291.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,400.00 pursuant to the fraudulent bills submitted by P&S Equipment, Kupina, and John Doe Defendant "1".

292.    The extensive fraudulent conduct of P&S Equipment, Kupina, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

293.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against P&S Equipment, Kupina, and John Doe Defendant "1"**
**(Unjust Enrichment)**

294.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

295.    As set forth above, P&S Equipment, Kupina, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

296.    When GEICO paid the bills and charges submitted by or on behalf of P&S Equipment for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

297.    P&S Equipment, Kupina, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that P&S Equipment, Kupina, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

298.    The retention of GEICO's payments by P&S Equipment, Kupina, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

299.    By reason of the above, P&S Equipment, Kupina, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $141,400.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Medihealth Supply, Zator Supplies, AAPS Supply, and P&S Equipment have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $305,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $305,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Medihealth Supply, Gorelik, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $46,500.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Medihealth Supply, Gorelik, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $46,500.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Zator Supplies and John Doe Defendant "1" for more than $43,300.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Zator Supplies and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $43,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against AAPS Supply, Rader, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $73,600.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.	On the Ninth Cause of Action against AAPS Supply, Rader, and John Doe Defendant "1" for more than $73,600.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

J.	On the Tenth Cause of Action against P&S Equipment, Kupina, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,400.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.	On the Eleventh Cause of Action against P&S Equipment, Kupina, and John Doe Defendant "1" for more than $141,400.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:	October 6, 2025
	Uniondale, New York

RIVKIN RADLER LLP


By:	/s/  *Michael A. Sirignano*
	Barry I. Levy
	Michael A. Sirignano
	Joanna Rosenblatt
	Rawson Jahan
926 RXR Plaza p
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*